**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| <br>TEXAS DEFENDER SERVICE, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE, <u>et al.</u>,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)       Civil Action No. 18-426 (RBW) |

## <u>MEMORANDUM OPINION</u>

The plaintiffs, Texas Defender Service ("TDS"), John Allen Rubio, Gabriel Paul Hall,

and Brian Edward Davis (the "individual plaintiffs") (collectively, the "plaintiffs"), bring this

civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (2018),

against the defendants, the United States Department of Justice (the "Department") and William

Barr,[1] in his official capacity as the Attorney General of the United States (collectively, the

"defendants"), seeking "injunctive and other relief to set aside the Final Rule regarding

Certification Process for State Capital Counsel, 78 Fed. Reg. 58,160 (Sept. 23, 2013)" (codified

at 28 C.F.R. pt. 26) (the "2013 Regulations").  Complaint and Request for Injunctive Relief

("Compl.") ¶¶ 1, 3.  Currently pending before the Court is the Defendants' Motion to Dismiss

("Defs.' Mot.").[2]  After careful consideration of the parties' submissions, the Court concludes for

the reasons set forth below that it must grant the defendants' motion to dismiss.

---

[1] William Barr is substituted for Jefferson B. Sessions as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the memorandum in support of the Defendants' Motion to Dismiss ("Defs.' Mem."); (2) the Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n"); and (3) the Defendants' Reply to Plaintifs' Opposition to Defendants' Motion to Dismiss ("Defs.' Reply").

# I.     BACKGROUND

## A.     Chapter 154 of the AEDPA and the 2013 Regulations

The Sixth Amendment to the United States Constitution states that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

defence."  U.S. Const. amend. VI.  Additionally, federal law guarantees indigent state and

federal capital prisoners the right to counsel in federal habeas proceedings.  18 U.S.C.

§ 3599(a)(2) (2018).  However, the Constitution does not guarantee a similar right to counsel in

state postconviction proceedings.  See Murray v. Giarratano, 492 U.S. 1, 10 (1989) (holding that

neither the Eighth Amendment nor the Due Process Clause guarantees indigent capital prisoners

the right to counsel in state postconviction proceedings); Pennsylvania v. Finley, 481 U.S. 551,

552 (1987) (noting that "States have no obligation to provide" postconviction relief, "and when

they do, the fundamental fairness mandated by the Due Process Clause does not require that the

State supply a lawyer as well").

In an attempt to address this limitation on representation for capital prisoners in state

postconviction proceedings, Congress passed Chapter 154, Title 28 of the United States Code

("Chapter 154"), 28 U.S.C. §§ 2261–66 (2018), as part of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), which "provides procedural benefits to states that voluntarily

appoint counsel to represent indigent capital prisoners during state postconviction proceedings."

Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice, 816 F.3d 1241, 1244 (9th Cir. 2016) (citing 28

U.S.C. §§ 2261–66), cert. denied, 137 S. Ct. 1338 (2017).

> If Chapter 154 applies in a federal habeas case, then, among other things, (1) the
> capital prisoner can secure an automatic stay from execution while his
> postconviction and federal habeas proceedings are ongoing; (2) the statute of
> limitations for filing a federal habeas petition is shortened from one year to six
> month from the date of final judgment of the state courts on direct appeal; and

(3) the federal courts must give priority status to the habeas case and resolve it within the time periods specified by Chapter 154.

Id. at 1245 (citations omitted).  These procedural benefits of Chapter 154 are available only if "(1) the Attorney General of the United States certifies that a State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265; and (2) counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, or petitioner was found not to be indigent."  28 U.S.C. § 2261(b).  The Attorney General's certification decisions are subject to de novo review by the District of Columbia Circuit.  Id. § 2265(c)(2), (3).

Chapter 154 also requires the Attorney General to "promulgate regulations to implement the certification procedure," id. § 2265(b), which the Attorney General did on September 23, 2013, see Certification Process for State Capital Counsel Systems, Fed. Reg. 58,160 (Sept. 23, 2013) (codified at 28 C.F.R. pt. 26).

> The [2013] Regulations establish a procedure for certifying whether a state's mechanism is adequate for the appointment of professionally competent counsel to represent indigent capital prisoners during state postconviction proceedings.  The [2013] Regulations require a state to request certification; the Attorney General must post the state's request on the Internet, solicit public comments, and review such comments during the certification process.  If the Attorney General certifies that a state's capital-counsel mechanism conforms to the requirements of Chapter 154 and the [2013] Regulations, she [or he] must also determine the date on which the state established its mechanism.  The certification is effective as to the date the Attorney General finds the state established its adequate mechanism; as this date can be in the past, a certification decision may be applied retroactively.

> The [2013] Regulations also set forth the substantive criteria that a state's capital-counsel mechanism must be certified.  Consistent with 28 U.S.C. § 2261(c)–(d), a state's mechanism must require a court of record to appoint counsel to represent an indigent capital prisoner in state postconviction proceedings unless a capital prisoner competently rejected the offer of counsel or was not indeed indigent.  If the court appoints counsel, the attorney must not have represented the prisoner at trial, unless the attorney and prisoner expressly agree otherwise.  Under the [2013] Regulations, a state's capital-counsel mechanisms must include competency and compensation standards for counsel appointed pursuant to the mechanism.  The [2013] Regulations provide two competency benchmarks, as well as a catchall provision for mechanism that otherwise reasonably assure a level of proficiency

appropriate for State postconviction litigation in capital cases.  Similarly, the [2013] Regulations provide four compensation benchmarks, as well as a catchall provision for mechanisms that are otherwise reasonably designed to ensure the availability for appointment of counsel satisfying the competency standards.  A state's mechanism must also authorize payment of the reasonable litigation expenses of appointed counsel.

Habeas Corpus Res. Ctr., 816 F.3d at 1245–46 (citations and internal quotation marks omitted).

## B.    Procedural History

According to the plaintiffs, on March 11, 2013, the State of Texas ("Texas") submitted a certification request to the United States Attorney General.  Compl. ¶ 38.  "On November 16, 2017, the Department . . . published a notice in the Federal Register advising the public of Texas's certification request and initiating a sixty-day public comment period."  Id. ¶ 39.  "On December 18, 2017, Texas submitted an amended application for certification in the form of a short supplemental letter to the Department . . . advising it of changes that had been made to [Texas's] system for appointing post[]conviction counsel since [the] initial request" for certification in 2013.  Id.  "On December 27, 2017, the Department . . . published a notice advising the public of Texas's supplemental letter and extending the comment period to February 26, 2018."  Id.

TDS "is a non-profit organization established in 1995 by experienced Texas death penalty attorneys," id. ¶ 10, and on February 23, 2018, TDS and the individual plaintiffs filed their Complaint with this Court, challenging the 2013 Regulations, see id. at 1.  "TDS works to improve the quality of representation afforded to those facing a death sentence and to expose and eradicate the systematic flaws plaguing the Texas death penalty" system and "represent[s] death-sentenced Texas prisoners in post[]conviction proceedings in federal court."  Id.  As of the date of the filing of Complaint, "TDS [was] participating in the public comment process and [was] [ ] preparing its substantive comment for submission."  Id. ¶ 40.  The individual plaintiffs are capital

prisoners in Texas, all of whom are "currently in simultaneous direct appeal and state post[]conviction proceedings." See id. ¶¶ 11–13.

On June 26, 2018, the defendants filed their motion to dismiss the plaintiffs' Complaint, see Defs.' Mot. at 1, which is the subject of this Memorandum Opinion.

## II.     STANDARDS OF REVIEW

### A.     Rule 12(b)(1) Motion to Dismiss

"Federal [district] courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction,'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to dismiss a claim if it "lack[s] . . . subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because "[i]t is to be presumed that a cause lies outside [a federal court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that the Court has subject-matter jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

In deciding a motion to dismiss for lack of subject-matter jurisdiction, the Court "need not limit itself to the allegations of the complaint."  Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the questions [of] whether it has jurisdiction [over] the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all

inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13–14 (internal quotation marks omitted).

**B.      Rule 12(b)(6) Motion to Dismiss**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Thus, to survive a motion to dismiss for "failure to state a claim upon which relief may be granted," Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A "claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556); see Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (noting that the plaintiff is entitled to "the benefits of all inferences that can be derived from the facts alleged").  Although the Court must accept the facts pleaded as true, legal allegations devoid of factual support are not entitled to this presumption.  See, e.g., Kowal, 16 F.3d at 1276.  In addition to allegations asserted within the four corners of the complaint, the Court may also consider "any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice."  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.   ANALYSIS

This Court's authority under Article III of the United States Constitution is limited to adjudicating actual cases and controversies.  Honig v. Doe, 484 U.S. 305, 317 (1988).  "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine."  Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

The defendants move to dismiss the plaintiffs' Complaint, arguing that the "[p]laintiffs have failed to present an Article III case or controversy, and therefore[,] this Court lacks jurisdiction over this case."  Defs.' Mot. at 1.  Specifically, the defendants argue that (1) the "[p]laintiffs lack standing to assert any of their claims, as plaintiffs do not challenge any 'final agency action' under the . . . []APA[]"; id.; (2) the "[p]laintiffs' claims are [ ] not ripe for review," id.; and (3) "review under the APA is precluded by statute, which provides a special review proceeding for the types of claims plaintiffs seek to raise," id.  The plaintiffs respond that (1) they have standing to bring their claims because "the 2013 Regulations have frustrated [TDS's] ability to advance its mission and have drained organizational resources that would otherwise be directed towards ordinary programs" and the individual plaintiffs "face an imminent threat of deprivation of their legal rights," Pls.' Opp'n at 2; (2) their "claims are ripe for judicial resolution" because their claims "challenge the 2013 Regulations, the promulgation of which unquestionably constitutes final agency action," and "are purely legal" and therefore "presumptively reviewable," id.; and (3) they "have no adequate alternative remedy that precludes this Court's review under Section 704 of the . . . []APA[]," id.

A.      **Standing**

The defendants first argue that neither TDS nor the individual plaintiffs can establish

standing to assert their claims.  See Defs.' Mem. at 11–14.  To establish standing, the plaintiff

must satisfy three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) actual or
> imminent, not conjectural or hypothetical.   Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to be
> fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not before the court.  Third,
> it must be likely, as opposed to merely speculative, that the injury will be redressed
> by a favorable decision.

Lujan, 504  U.S. at 560–61 (alterations in original) (citations and internal quotation omitted).

> Where . . . the lawsuit challenges the legality of government action, the nature of
> the standing inquiry depends largely on "whether the plaintiff is himself an object
> of the action . . . at issue."  When a plaintiff is subject to the challenged regulation
> or policy, "there is ordinary little question that the [government] action . . . has
> caused him injury, and that a judgment preventing . . . the action will redress it."
> But, when a "plaintiff's asserted injury arises from the government's allegedly
> unlawful regulation . . . of someone else, much more is needed."  Standing in those
> cases is not foreclosed entirely, "but it is ordinarily 'substantially more difficult' to
> establish."

Sanchez v. Office of State Superintendent of Educ., Civ. Action No. 18-975 (RC), 2019 WL

935330, at *4 (D.D.C. Feb. 26, 2019) (second through sixth alterations in original) (citations

omitted) (quoting Lujan, 504 U.S. at 561–62).   "While the burden of production to establish

standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must

nonetheless allege general factual allegations of injury resulting from the defendant's conduct

(notwithstanding the court presum[es] that general allegations embrace the specific facts that are

necessary to support the claim)."  Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 12 (D.C.

Cir. 2011) (alteration in original) (internal quotation marks omitted).

The Court will address separately whether each set of plaintiffs have standing in turn.

1.     **TDS**

The defendants argue that TDS lacks standing because "[a]n attorney's interest in the legal standards for the field of law in which he or she practices is not the sort of legally protected interest that establishes Article III standing," Defs.' Mem. at 12, and TDS "cannot evade the conjectural and speculative nature of [its] alleged injuries simply by claiming that [it] feel[s] compelled to take steps now—modifying [its] advice to clients and/or adapting [its] litigation strategies—because of [its] concerns about possible changes to the applicable legal framework in the future," id. The plaintiffs respond that TDS has standing because (1) "the 2013 Regulations frustrate its ability to further [its] mission," and (2) "it has been forced to expend resources to counteract the[] ill effects" of the 2013 Regulations. Pls.' Opp'n at 15.

When an organization seeks to pursue claims on its own behalf, "organizational standing requires [the organization], 'like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting Equal Rights Ctr. v. Post Props., 633 F.3d 1136, 1138 (D.C. Cir. 2011)).

> In Havens Realty Corp. v. Coleman, the Supreme Court held that a "concrete and demonstrable injury to an organization's activities"—there, providing "counseling and referral services"—can support Article III standing if the organization can show a "consequent drain on [its] resources" and "more than simply a setback to the organization's abstract social interests."

Public Citizen, Inc. v. Trump, 297 F. Supp. 3d 6, 36–37 (D.D.C. 2018) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)). "The [District of Columbia] Circuit has 'establishe[d] two important limitations on the scope of standing under Havens,' with a two-prong inquiry." Nat'l Fair Housing Ass'n v. Carson, 330 F. Supp. 3d 14, 42 (D.D.C. 2018) (second alteration in original) (quoting Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n

on Election Integrity, 878 F.3d 371, 378 (D.C Cir. 2017)).  "First, the plaintiff must show that the

defendant's 'action or omission to act injured the organization's interest.'  Second, the plaintiff

must show that it 'used its resources to counteract that harm.'"  Elec. Privacy Info. Ctr., 878 F.3d

at 378 (citations omitted) (quoting People for the Ethical Treatment of Animals v. USDA, 797

F.3d 1087, 1094 (D.C. Cir. 2015)).

As to the first prong of the injury-in-fact component of standing under Havens, the

plaintiffs argue that the 2013 Regulations frustrate TDS's ability to advance its mission because

"[t]he absence of meaningful guidance in the [2013] Regulations, combined with the draconian

retroactive effect[,] impairs TDS's ability to provide sound legal advice and make strategic

decisions with respect to its clients' cases."  Pls.' Opp'n at 20.  They further argue that "[i]f

Texas were certified, TDS would immediately have to devote substantial resources to investigate

its clients' claims and prepare their petitions to meet the shortened deadlines," and that "[t]o

avoid this untenable strain on its resources, TDS has been forced to act conservatively in

accepting new clients."  Id. at 20.  In her declaration in support of the plaintiffs' opposition,

Amanda Marzullo, the Executive Director of TDS, explains that "[t]hese decisions directly affect

TDS's finances" because "TDS receives compensation for acting as court-appointed counsel and

for providing mitigation investigation services," and "[w]hen TDS is unable to accept new

appointments, it loses the opportunity to earn those fees."  Id., Exhibit ("Ex.") 1 (Declaration of

Amanda Marzullo in Opposition to Defendants' Motion to Dismiss ("Marzullo Decl.")) ¶ 20.

The first prong of the injury-in-fact requirement of standing under Havens is satisfied

"when the plaintiff demonstrates that a direct conflict exists between the defendant's conduct and

the organization's mission, and when the defendant's conduct causes an inhibition of [the

organization's] daily operations."  Nat'l Fair Housing Ass'n, 330 F. Supp. 3d at 41–42 (second

alteration in original) (citations and internal quotation marks omitted).  Here, the Court

concludes that because "TDS's mission is to establish a fair and just criminal justice system in

Texas" and a significant aspect of TDS's work includes "represent[ing] death-sentenced

prisoners in post[]conviction proceedings in federal court," Compl. ¶ 10, the 2013 Regulations—

particularly the provision allowing for the potential retroactive application of certification, see 28

C.F.R. § 26.23(c) ("The certification will include a determination of the date the capital counsel

mechanism qualifying the State for certification was established.")—is "'at loggerheads' with

[TDS's] mission-driven activities."  Nat'l Fair Housing Ass'n, 330 F. Supp. 3d at 42 (quoting

Nat'l Treasury Emps. Union, 101 F.3d at 1429).  Moreover, based on the information currently

before the Court, the 2013 Regulations "inhibit[] [ ] [TDS's] daily operations," id. (quoting Food

& Water Watch v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015)), by impacting TDS's finances,

see Pls.' Opp'n, Ex. 1 (Marzullo Decl.) ¶ 10.  The Court therefore concludes that TDS has

satisfied the first prong of the injury-in-fact requirement of standing under Havens.

As to the second prong of the injury-in-fact requirement of standing under Havens, the

plaintiffs argue that "[b]ecause the 2013 Regulations require virtually nothing from Texas and

instead place the burden on the public to disprove the state's eligibility for certification, TDS has

been forced to expend substantial resources to prepare its comments opposing Texas's request."

Id. at 18.  According to the plaintiffs, "[t]he preparation of TDS's comments consumed over 100

hours of TDS staff time, diverting their attention from their ordinary responsibilities."  Id.

The second prong of the injury-in-fact requirement of standing under Havens is satisfied

upon a "show[ing] [by the plaintiff] that it used its resources to counteract [the] harm caused by

the defendant's action or omission to act.  The plaintiff must demonstrate that it has expended

operational costs beyond those normally expended to carry out its advocacy mission."  Nat'l Fair

Housing Ass'n, 330 F. Supp. 3d at 42 (third alteration in original) (citation and internal quotation marks omitted).  However, this Circuit "ha[s] [ ] recognized that the expenditure of resources on advocacy is not a cognizable Article III injury."  Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015) (citing Ctr. for Law and Educ. v. Dep't of Educ., 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005)); see also Nat'l Ass'n of Home Builders, 667 F.3d at 12 (rejecting organization's argument that it had standing based on the fact that "it ha[d] spent considerable staff time and monetary resources in the quest to clarify [Clean Water Act] jurisdiction, such as submitting comments to the [Environmental Protection Agency] . . . [and] testifying before the United States Senate" because the organization "ha[d] not shown [that] they were operational costs beyond those normally expended to carry out its advocacy mission" (internal quotation marks omitted)); Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").  Despite the fact that Ms. Marzullo represents in her declaration that advocacy is a core part of TDS's mission, see Pls.' Opp'n, Ex. 1 (Marzullo Decl.) ¶ 4 ("TDS engages in policy reform, which includes issue advocacy, research and writing, and communications . . . .  Through its advocacy and research, TDS endeavors to expose and eradicate the systematic flaws that plague the Texas death penalty [system]."), TDS's position that it has been "forced to expend substantial resources to prepare its comments" and that its staff "divert[ed] their attention from their ordinary responsibilities," id. at 18, fails to satisfy the second prong of injury-in-fact under Havens because TDS has not shown that preparing comments to advocate against Texas's certification was an "operational cost[] beyond those normally expended to carry out its advocacy mission," Nat'l Ass'n of Home Builders v. EPA,

667 F.3d at 12; cf. Turlock Irrigation Dist., 786 F.3d at 24 ("The Trust's decision to expend more of its resources by participating in both Don Pedro's and La Grange's licensing proceedings is the type of alleged harm that we have repeatedly held does not qualify as an injury in fact."). Therefore, because TDS has failed to demonstrate that it has suffered an injury-in-fact under Havens, the Court is compelled to conclude that TDS does not have organizational standing to challenge the 2013 Regulations.[3]

### 2.    The Individual Plaintiffs

The defendants argue that the individual plaintiffs lack standing because they "are not currently suffering the loss of any important procedural rights, and they do not establish that, even if Texas's request for certification were to be granted, it would be applied retroactively to curtail or eliminate the time available to them for federal habeas filing."  Defs.' Reply at 10–11. The individual plaintiffs respond that they have standing because "[t]he potential retroactive effect of a certification means that they could find themselves unexpectedly out of time to file their federal habeas petitions," Pls.' Opp'n at 25, and they contend that "[t]he loss of important procedural rights, particularly for a death-sentenced prisoner, clearly constitutes injury in fact," id. at 26.

> Where a plaintiff has yet to face prosecution under a statute he seeks to challenge, the Supreme Court, in Babbitt v. United Farm Workers, requires that he establish Article III standing by (1) "alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional  interest, but proscribed by a statute," and (2) demonstrating that "there exists a credible threat of prosecution thereunder."  In Navegar, Inc. v. United States, however, [this Circuit] held that plaintiffs must show more than a "credible threat" of prosecution: they must demonstrate an "imminent" threat of prosecution.

---

[3] Because the Court concludes that TDS has not demonstrated that it has suffered an injury-in-fact necessary to confer organizational standing under Havens, the Court need not separately address whether TDS's alleged injury "is fairly traceable to the [2013 Regulations] and likely to be redressed by a favorable court decision."  Food & Water Watch, Inc., 808 F.3d at 919.

Ord v. District of Columbia, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (first alteration in original) (citations omitted) (first quoting Babbitt v. United Farm Workers, 442 U.S. 289, 299 (1979); then quoting Navegar, Inc. v. United States, 103 F.3d 994, 999 (D.C. Cir. 1997)).

"To prove that a threat is both credible and imminent, [this Circuit] requires plaintiffs to demonstrate that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the . . . government for prosecution.'" Id. at 1140–41 (quoting Parker v. District of Columbia, 478 F.3d 370, 375 (D.C Cir. 2007), aff'd in part sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008)).  In Seegars v. Gonzales, the Circuit "not[ed] that Navegar's analysis is in sharp tension with standard rules governing preenforcement challenges to agency regulations, where an affected party may generally secure review before enforcement so long as the issues are fit for judicial review without further factual development and denial of immediate review would inflict a hardship on the challenger," 396 F.3d 1248, 1253 (D.C. Cir. 2005), but nonetheless "faithfully appl[ied] the analysis articulated by Navegar," id. at 1254.

Here, the individual plaintiffs fail to demonstrate a credible and imminent threat of prosecution under the 2013 Regulations.  "A credible threat of prosecution exists when 'the [challenged] law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Backpage.com, LLC v. Lynch, 216 F. Supp. 3d 96, 102 (D.D.C. 2016) (Walton, J.) (emphasis added) (alteration in original) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392 (1988)).  Here, the challenged regulation is not aimed directly at the individual plaintiffs because, as the Ninth Circuit observed in Habeas Corpus Resource Center, "[t]he [2013] Regulations . . . do not act upon capital prisoners but guide the Attorney General's

certification of state capital-counsel mechanisms.  A capital prisoner's federal habeas rights may

be affected indirectly, <u>if</u> the sentencing state requests certification and <u>if</u> the Attorney General

finds that the state's capital-counsel mechanism comports with Chapter 154 and the [2013]

Regulations."  816 F.3d at 1252 (citation omitted) (citing 28 C.F.R. §§ 26.22–.23)); <u>cf.</u> <u>Navegar</u>,

103 F.3d at 1000 (finding that the plaintiffs had standing in a pre-enforcement challenge to a

statute that "prohibit[ed] weapons that only the [plaintiffs] make").  The 2013 Regulations

therefore do not have the coercive impact necessary to confer standing on the individual

plaintiffs to bring their preenforcement challenge to the 2013 Regulations.  <u>See</u> <u>Calderon v.</u>

<u>Ashmus</u>, 523 U.S. 740, 748–49 (1988) (rejecting the plaintiff's argument that "the State's

'threat' to assert Chapter 154 in habeas proceedings and the risk that the class members w[ould]

thereby lose their rights to application of Chapter 153 [were] sufficient to establish standing,"

reasoning that "California's assertions on Chapter 154 have no coercive impact on the legal

rights or obligations of either party[] [because] [i]t is the members of the class, and not the State,

who anticipate filing lawsuits").  Accordingly, the Court must conclude that the individual

plaintiffs have not satisfied "the stringent requirements for pre-enforcement standing under

<u>Navegar</u> and <u>Seegars</u>."  <u>Parker</u>, 478 F.3d at 376.

## B.     Ripeness

Even if the Court could conclude that the plaintiffs had standing to pursue the relief

sought in this case, the doctrine of ripeness would pose an additional bar to the plaintiffs'

lawsuit.  The defendants argue that the "plaintiffs['] claims are not ripe, as there has been no

final decision on Texas's amended application."  Defs.' Mem. at 17.  The plaintiffs respond that

their claims are ripe because they "do not challenge the merits of Texas's request.  Rather, they

challenge the Regulations that govern the certification process, which are final and have already gone into effect." Pls.' Opp'n at 31. The Court agrees with the defendants.

The ripeness doctrine, which "generally deals with when a federal court can or should decide a case," Am. Petroleum Inst. v. EPA, 683 F.3d 382, 386 (D.C. Cir. 2012), is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties,'" Chlorine Inst., Inc. v. Fed. R.R. Admin., 718 F.3d 922, 927 (D.C. Cir. 2013) (quoting Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior, 538 U.S. 803, 807–08 (2003)). "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n, 527 U.S. at 808. "To do so . . . , [the Court] must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).

In Habeas Corpus Resource Center, the plaintiffs challenged the same 2013 Regulations at issue in this case on similar grounds. See 816 F.3d at 1246–47. Analyzing the ripeness of the plaintiffs' challenge to the 2013 Regulations under the Ohio Forestry framework, the Ninth Circuit concluded that the challenge was not ripe for judicial review. Id. at 1254. As to the first Ohio Forestry factor, the Ninth Circuit concluded that "[d]elayed judicial review of the [2013] Regulations is unlikely to cause hardship to capital prisoners, even if they might change their strategy for pursuing postconviction relief in light of the promulgation of the [2013]

Regulations," because "[t]he [2013] Regulations do not require anything of capital prisoners—or indeed of their lawyers—and do not immediately alter their federal habeas corpus rights or procedures." Id. at 1253; see id. (explaining that "[b]efore a capital prisoner's rights may be affected, the sentencing state must request certification by the Attorney General, the Attorney General must (under the [2013] Regulations) allow for public comment on the request, and the Attorney General must then certify that the state's capital-counsel mechanism is compliant with Chapter 154"). As to the second Ohio Forestry factor, the Ninth Circuit concluded that "judicial interference [w]ould hinder agency efforts to refine its policies," because the alleged problems with the 2013 Regulations that the plaintiffs took issue with—i.e., "that the [2013] Regulations do not make clear precisely how the Attorney General will conduct the certification process, how the Attorney General will make certification decisions, and how the Attorney General will apply the catchall provision for competency of counsel"—would "sort themselves out as the Attorney General applies the [2013] Regulations, makes certification decisions, and justifies those decisions in the [District of Columbia] Circuit, if indeed challenged." Id. at 1253–54. As to the final Ohio Forestry factor, the Ninth Circuit concluded that "in the absence of a concrete application of the [2013] Regulations, the challenges to the substance of the [2013] Regulations represent ''abstract disagreements over administrative policies,' that the ripeness doctrine seeks to avoid.'" Id. at 1254 (quoting Ohio Forestry, 523 U.S. at 736).

The Court finds the Ninth Circuit's reasoning persuasive. Like the Ninth Circuit, this Court concludes that delayed judicial review of the 2013 Regulations will not cause hardship to the plaintiffs. As the Supreme Court has explained:

> Absent [a statutory provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the . . . []APA[] until the scope of the controversy has been reduced to more manageable proportions, and its factual components, by some concrete action

> applying the claimant's situation in a fashion that harms or threatens to harm him.
> (The major exception, of course, is a substantive rule which as a practical matter
> requires the plaintiff to adjust his conduct immediately . . . .)

Nat'l Park Hosp. Ass'n, 538 U.S. at 808 (first and fifth alterations in original) (internal quotation

marks omitted) (quoting Lujan v. Nat'l Wildlife Fed., 487 U.S. 871, 891 (1990)).  Here, the

"major exception" does not apply because, as previously discussed, the 2013 Regulations are not

"aimed directly" at the plaintiffs.  Backpage.com, LLC, 216 F. Supp. 3d at 102; see Nat'l Park

Hosp. Ass'n, 538 U.S. at 810, 812 (finding that the plaintiff "ha[d] failed to demonstrate that

deferring judicial review [of the regulation] w[ould] result in real hardship" because the

regulation "d[id] not affect a concessioner's primary conduct").

The Court similarly concludes that the issues are not fit for judicial review at this time.

The plaintiffs correctly note that their claims are "purely legal," Pls.' Opp'n at 31, and that the

2013 Regulations constitute final agency action,  id. at 32.  However, "[a]lthough the question

presented here is a purely legal one and [the 2013 Regulations] constitute final agency action

within the meaning of § 10 of the APA, [the Court] nevertheless believe[s] that further factual

development would significantly advance [its] ability to deal with the legal issues presented."

Nat'l Park Hosp. Ass'n, 538 U.S. at 812 (citations and internal quotation marks omitted).

Specifically, in the absence of a determination by the Attorney General on Texas's certification

request, the effects of the 2013 Regulations have not been "felt in a concrete way by the

challenging parties," therefore making judicial review premature.  See In re Aiken Cty., 645 F.3d

428, 434 (D.C. Cir. 2011) ("But when an agency decision may never have its effects felt in a

concrete way by the challenging parties, the prospect of entangling ourselves in a challenge to

such a decision is an element of the fitness determination as well.  Hence, a claim is not ripe for

adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citations and internal quotation marks omitted)).

Accordingly, the Court concludes that the plaintiffs' claims are not yet ripe for review.[4]

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiffs do not have standing in this action and the plaintiffs' challenge is not yet ripe for judicial review.  Accordingly, it grants the defendants' motion to dismiss.[5]

**SO ORDERED** this 9th day of April, 2019.


REGGIE B. WALTON
United States District Judge

---

[4] Because the Court concludes that dismissal of the plaintiffs' claims on standing and ripeness grounds is appropriate, the Court need not address the defendants' alternative argument that the plaintiffs' claims are precluded under the APA.  <u>See</u> Defs.' Mem. at 15–16.

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.